UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

STAMP FARMS, L.L.C., *et al.*, [1]                    Case No. DK 12-10410
                                                     Chapter 11
            Debtor.                                  Hon. Scott W. Dales
_____/

OPINION AND ORDER

PRESENT:    HONORABLE SCOTT W. DALES
            United States Bankruptcy Judge

By Order to Show Cause dated May 10, 2013 ("Show Cause Order," DN 772), the court directed interested parties to show cause why the court should not convert these cases under 11 U.S.C. § 1112 or appoint a trustee under 11 U.S.C. § 1104.  The court issued the Show Cause Order, *sua sponte*, in response to actions that Thomas R. Tibble, the trustee in Michael Stamp's chapter 11 bankruptcy case, and Melissa Stamp, the member of Royal Star Farms, L.L.C. ("Royal Star Farms"), reportedly took to displace the Debtors' manager, O'Keefe & Associates Consulting, L.L.C. ("O'Keefe").  Mr. Tibble's and Mrs. Stamp's challenge to O'Keefe's authority is premised largely on the irrevocable proxies that Mr. and Mrs. Stamp executed prepetition, after Wells Fargo Bank, National Association ("Wells Fargo") and others raised serious questions about Mr. Stamp's management of the Debtors.

_____

[1] The Debtors are: Stamp Farms Trucking, L.L.C. (Case No, 12-10411); Stamp Farms Custom AG, L.L.C. (Case No. 12-10416); and Royal Star Farms, L.L.C. (Case No. 12-10417).

The Debtors have responded to the Show Cause Order (DN 795), amplifying the arguments they advanced in the Debtors' Motion to Enforce Court's Opinion and Order dated January 18, 2013 [DN 284] (the "Motion to Enforce," DN 763).   Other interested parties have also filed responses.   The court held a hearing on May 23, 2013 (the "Show Cause Hearing") to consider the issues that prompted the Show Cause Order and that the parties discuss in their responses.

At the Show Cause Hearing, the court heard testimony from Patrick M. O'Keefe, regarding the relative costs and benefits of converting the case to chapter 7 versus keeping his firm in place in a chapter 11.  The court also considered the Liquidation Analysis that he or his associates prepared in connection with the Joint Chapter 11 Plan of Liquidation and Disclosure Statement of the Debtors and the Official Committee of Unsecured Creditors filed on May 9, 2013 (the "Plan," DN 766).  In addition, the United States Trustee ("UST"), through counsel and without objection, made a proffer of evidence to establish that it had made no promises to Mr. Tibble about a future role for him as the Debtors' possible chapter 7 or chapter 11 trustee.

The following constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52 and Fed. R. Bankr. P. 7052.

## I.   JURISDICTION

The court has jurisdiction over the Debtors' bankruptcy cases pursuant to 28 U.S.C. § 1334(a), and the contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).  The United States District Court, by local rule, has referred the case and this proceeding to the bankruptcy judges of this District. 28 U.S.C. § 157(a); LCivR 83.2(a).

## II.  ANALYSIS

1.  The Proxies and the Bankruptcy Filing

By way of background, on November 6, 2012, Michael D. Stamp and Melissa S. Stamp, as the sole owners of the Debtors, elected O'Keefe as the Debtors' manager and, through irrevocable voting proxies (the "Proxies," DN 1, Exh. 2) with a term of six months, effectively, though temporarily, ceded their membership interests to O'Keefe. O'Keefe then caused the Debtors to file chapter 11 bankruptcy petitions. Substantially all assets and contract rights of the Debtors were sold or assigned pursuant to two sale orders dated February 8, 2013 (DN 454) and March 21, 2013 (DN 605).  After the sales and without objection from interested parties, O'Keefe distributed a substantial portion of the proceeds to secured creditors, principally those holding purchase money security interests in farming equipment such as pivots, pumps, generators, and farm vehicles.  In addition, O'Keefe, or the buyer, made substantial payments to lessors of farmland throughout Southwest Michigan, essentially as cure payments required under 11 U.S.C. § 365 as a condition of the assumption by the estates and the assignment of valuable leases to the successful bidder. Only the distribution of some sale proceeds, collection of some accounts receivable, insurance claims, lender and professional liability actions, and possible chapter 5 recoveries remain for administration.[2]

The Proxies expired by their own terms on May 6, 2013, vesting Michael Stamp's membership interests in Mr. Tibble as trustee in Michael Stamp's bankruptcy case, and restoring Mrs. Stamp to her rights with respect to Royal Star Farms.  On May 8, 2013, Mr. Tibble executed a Member Consent Resolution directing O'Keefe to (1) convert the Debtors' cases to

---

[2] The brevity of the court's summary is in no way intended to detract from the substantial service that O'Keefe, the Committee, Mr. Tibble, and various professionals have rendered to the respective estates and their creditors during the relatively few months the cases have been pending.

chapter 7, and (2) confirm receipt of the resolution by May 9, 2013 at noon (the "Conversion Resolution," DN 792, Exh. C). Mrs. Stamp took similar actions.

On May 9, 2013, the Debtors, through their attorney, Varnum, and the Official Committee of Unsecured Creditors (the "Committee"), filed their Plan. Having received from O'Keefe no confirmation of receipt of the Conversion Resolution, Mr. Tibble executed another resolution purporting to terminate O'Keefe as manager. (DN 792, Exh. D).

2. Management Vacuum Prompts Show Cause Order

On May 10, 2013, the court conducted an omnibus hearing in the Debtors' bankruptcy cases, but before reaching the merits of any of the scheduled matters, Mr. Tibble, through counsel, reported that he had terminated O'Keefe, and that Varnum was no longer authorized to represent or speak for the Debtors. Because there appeared to be a vacuum in the management of the Debtors or at least a struggle for management control, the court issued the Show Cause Order and limited both O'Keefe and Mr. Tibble from engaging in further transactions involving property of the Stamp Farms bankruptcy estates, without further court order. The Show Cause Order did not limit Mr. Tibble with respect to the only bankruptcy estate that he unquestionably represents—the Michael Stamp estate.

The court invited responses to the Show Cause Order and several parties replied. In addition to the Debtors, responding parties include: Melissa Stamp (DN 785), the UST (DN 788), First Farmers Bank & Trust (DN 791), Mr. Tibble (DN 792), Wells Fargo (DN 796), and the Committee (DN 797). The court carefully reviewed each response in advance of the Show Cause Hearing and discovered that with the exception of the Debtors, through Varnum, and the Committee, the responding parties support conversion. The Debtors and the Committee argue for preserving the *status quo* by keeping O'Keefe at the helm.

3.  <u>Positions of the Parties</u>

Varnum argues under state limited liability law that Mr. Tibble and Mrs. Stamp, as the holders of the membership interests in the Debtors, does not have management authority and cannot direct O'Keefe to undertake any executive action. Furthermore, according to Varnum, Mr. Tibble and Mrs. Stamp may not terminate O'Keefe without first filing a motion under 11 U.S.C. § 1104(a) for which, Varnum argues, there is no basis. Finally, Varnum asserts that neither Mr. Tibble nor Mrs. Stamp qualifies as a "party in interest" as required by § 1104(a) because they do not "have a sufficient interest in the outcome of the case that would require representation, or a pecuniary interest that will be directly affected by the case." *In re Innkeepers USA Trust*, 448 B.R. 131 (Bankr. S.D.N.Y. 2011).

The Committee argues that with a proposed chapter 11 plan on file, existing management has all but resolved the differences between the two most significant creditor constituencies – Wells Fargo and the general unsecured creditors. According to Committee counsel, this is yet another example of how well the Committee, existing management, and all secured creditors have worked together to administer this case. If the chapter 11 is allowed to proceed, the Committee asserts there will be a faster and superior return for its creditors, in part because the Committee predicts that the administrative expenses of a chapter 7 proceeding will be greater than the amount the Committee and current management will use to tie up the remaining loose ends, and investigate and pursue possible chapter 5 recoveries.  Furthermore, the Committee claims that cause does not exist under 11 U.S.C. § 1104.  As for cause under 11 U.S.C. § 1112(b)(4)(A) (substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation), the court must consider whether "there is a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time." 11 U.S.C. §

1112(b)(2)(A)(ii). The Committee asserts that a modified liquidating plan providing for cram down can be filed and quickly confirmed.

All other parties support conversion, almost universally because they regard it as likely to reduce overall administrative expenses and the time required to conclude the cases. For its part, Wells Fargo (quite likely the largest unsecured creditor given a collateral shortfall), opposes the proposed liquidating Plan as filed and thus its confirmation, opposes any additional carve-out from its collateral, opposes the appointment of a chapter 11 trustee, and favors conversion to chapter 7.

    4.  <u>Cause to Convert</u>

Conversion requires a finding of "cause" as the applicable statute provides, but cause may also justify appointment of a trustee or examiner as an alternative:

> Except as provided in paragraph (2) and subsection (c), on request
> of a party in interest, and after notice and a hearing, the court shall
> convert a case under this chapter to a case under chapter 7 or dismiss
> a case under this chapter, whichever is in the best interests of
> creditors and the estate, for cause unless the court determines that
> the appointment under section 1104(a) of a trustee or an examiner
> is in the best interests of creditors and the estate. .    .    .

11 U.S.C. § 1112(b)(1). Having invoked, *sua sponte*, the dual possibilities of conversion or appointment of a trustee under 11 U.S.C. § 1112, and having given the constituents of these estates an opportunity to be heard at the Show Cause Hearing and in writing, it is incumbent upon the court to identify the cause, if any, for converting or directing the appointment of a trustee.

From the start of the Debtors' cases, the court has been concerned about the precarious or at least temporary authority that O'Keefe derives, under state law, from the Proxies. Under the terms of those documents, putting aside for the moment any federal equitable or statutory

authority the court may have to preserve management, it was plain to see that upon the expiration of the Proxies, by their own terms at the latest on May 6, 2013, O'Keefe would be transformed, like Cinderella's carriage, into an empty shell, losing its voting authority (though perhaps not its management authority) at the stroke of midnight. The court tolerated this precarious position for many months, rejecting the UST's similar concerns by denying that agency's motion for appointment of a trustee, and did so for both legal and practical reasons.

As a legal matter, when denying the UST's challenge to O'Keefe's authority last January, the court held that in chapter 11 cases, existing management, selected in accordance with non-bankruptcy law, pre-bankruptcy, presumptively remains in possession of the property of the estate, and functions, in effect, as trustee. *See* 11 U.S.C. § 1107. The court concluded that the holders of the membership interests in the Debtors appointed O'Keefe as manager, and transferred their voting rights to that entity under the Proxies. When the Debtors arrived (shortly thereafter) in bankruptcy court, management was in place under color of the Proxies, and no one established any misconduct by that management or other cause to displace O'Keefe. The Debtors, through Varnum, now argue that the court, in effect, prejudged Mr. Tibble's and Mrs. Stamp's corporate governance challenge when it preserved O'Keefe's role against the UST's challenge. This argument overstates the court's ruling, which was premised more on the state law underpinnings of management's authority, and less on the court's authority under 11 U.S.C. §§ 1104 or 1107.

As for the practical reasons, the court believed that a quick sale of the Debtors' farming assets—in time to permit a buyer to participate in spring planting—was the best way to maximize value for all concerned given the nature of the Debtors' business and assets. The only entity that saw things differently was the UST, who although charged with asserting the public

interest as the bankruptcy system's watchdog, had no pecuniary interest in the proceedings. The urgency of spring planting and its role in maximizing the value of farming assets persuaded the court not to displace O'Keefe who, by then, had familiarized itself with the Debtors' admittedly convoluted financial arrangements, and who appeared capable of navigating through a necessarily-accelerated sale process under 11 U.S.C. § 363(b).  Indeed, the success of these sales appears to have vindicated the court's tolerance of O'Keefe, despite its unusual entrance into the Debtors' affairs, and despite the looming deadline prescribed in the Proxies.

Now, however, these dual reasons for retaining O'Keefe no longer hold the same force as they did at the beginning of the case: the assets have been sold in time for spring planting, and the Proxies have expired on their own terms. Immediately upon the Proxies' expiration, the holders of the voting rights in the Debtors—Mr. Tibble in his representative capacity and Mrs. Stamp directly—mounted a challenge to O'Keefe's authority under state law to continue as Debtors' manager.  The controversy promises only to cost both estates considerable time and money.

Although the Debtors and the Committee would have the court put down Mr. Tibble's and Mrs. Stamp's attempted corporate *coup d'état* with the stroke of a pen in reliance on 11 U.S.C. §§ 105 and 1107, resolution is not so simple.   Putting aside the court's doubts about the manner in which Mr. Tibble and Mrs. Stamp pursued their corporate governance rights, the court does not doubt that these rights exist under state law. Corporate entities, as creatures of state law, persist, despite any bankruptcy filing, and so does state corporate governance law.  This is not to say that the court is powerless to prevent interference, but only to note that the court's respect for state corporate law is not fleeting.

Nor, for that matter, will the court's doubts about Mr. Tibble's and Mrs. Stamp's pecuniary interest (and therefore standing to be heard) in this matter preclude them from asserting whatever rights they have under corporate law.  First, all parties agree that holders of equity interests have certain legal rights under state law regarding selection of management. These rights derive from state law and they remain even if equity is "out of the money." Although bankruptcy courts generally insist that litigants must establish a pecuniary interest in a dispute in order to be heard in court, the standing requirement is not an issue elsewhere.  In other words, Mr. Tibble does not need Article III standing to take actions outside of court, such as exercising his right to vote or select management.  Just as state corporate law protected O'Keefe last January against the UST's challenge on the motion to appoint a trustee,  it and the *ipso facto* expiration of the Proxies may also undermine the firm's continued role should Mr. Tibble and Mrs. Stamp properly assert their corporate governance rights in this or some other court.

Suffice it to say that a full blown fight about corporate governance is on the horizon, and given the court's duty to respect state law as the rule of decision under 28 U.S.C. § 1652, the court will not summarily dismiss the corporate challenge, even though the contest will likely be an expensive and distracting side-show.

Ordinarily, the court would be inclined to agree with Debtors' counsel and the Committee that it should not reward Mr. Tibble's and Mrs. Stamp's heavy handed and perhaps unauthorized assault on O'Keefe's authority.  The court uses the term "unauthorized" because it  doubts that Mr. Tibble's "ordinary course" authority in the Michael Stamp estate allows him to *use* that estate's membership interest to displace management of the Stamp Farms estates, without an order under 11 U.S.C. § 363(b); it is astounded by his efforts to gain control over property of the

Debtors' bankruptcy estates, without first obtaining relief from the automatic stay;[3] and it has the lingering impression that he is using his authority as a member to gain advantage in his ongoing dispute with the Debtors about the division of sale proceeds. The Committee's supplemental memorandum supports the court's compunction and view that Mr. Tibble's corporate takeover is outside the ordinary course of business, using either the vertical or horizontal tests mentioned in the Committee's brief.

Although the court recognizes Mr. Tibble's new voting authority following the expiration of the Proxies, it hesitates to recognize any authority to hire and fire management without requiring him to first seek relief from the automatic stay, or obtaining an order in the Michael Stamp case authorizing him to take such actions. If Mr. Tibble's actions are voidable, rather than void, the management vacuum that prompted the court to enter the Show Cause Order may not yet exist, as Debtors' counsel argued during the Show Cause Hearing. Nevertheless, it appears certain that even these preliminary steps regarding stay relief or authority under 11 U.S.C. § 363 would excite opposition and add additional litigation expense, without resolving the corporate governance controversy that would nevertheless plague the case until resolved. And, during this time of preliminary wrangling over Mr. Tibble's authority to challenge Mr. O'Keefe's authority, it is conceivable that O'Keefe and the Committee could be formulating, negotiating, and filing an amended liquidating plan within the context of the current chapter 11 proceeding, although O'Keefe's authority as the Debtors' manager would remain in doubt.[4]

---

[3] For example, the last paragraph on the first page of Ms. Purkey's April 9, 2013 letter to Mr. O'Keefe concludes with this imperative: "the Trustee demands that the control of the assets of Stamp Farms, LLC, Stamp Farms Trucking, LLC, and Stamp Farms Custom AG, LLC be immediately surrendered to the Trustee on May 6, 2013." *See* Debtors' Motion to Enforce Court's Opinion and Order dated January 18, 2013 at Exh. D (DN 763).

[4] Indeed, it seems likely that Mr. Tibble would take such steps if required, and that O'Keefe and the Committee would pursue confirmation of their joint Plan, despite the controversy regarding O'Keefe's authority. With each step, of course, scarce estate resources—in the Michael Stamp and Stamp Farms cases—will dissipate as each of the estates incurs additional professional fees fighting about these issues. The court notes that all of the estates related in one way or another to Michael Stamp have large and numerous creditors in common.

Nevertheless, absent appointment of a trustee or conversion to chapter 7, some tribunal, whether this court or another, must resolve the corporate governance issues to ensure that O'Keefe, whether denominated as "manager" or "debtor in possession," is managing the property of the estate in accordance with state law.[5]  The dispute is inescapable.

Without making any prediction regarding the outcome of the  parties' disagreement in the murky realm of corporate governance in bankruptcy, three conclusions are quite clear: (1) Mr. Tibble and Mrs. Stamp have colorable rights under state law to effect a change in management now that the Proxies have expired; (2) resolving the corporate governance dispute will be a difficult, expensive, and time-consuming distraction from the typical business of Title 11; and (3) the Debtors' cases, at this point, are liquidation proceedings, not reorganizations.  Mr. O'Keefe's testimony confirmed this last point.  Under these circumstances, the court finds cause to convert.  There is no prospect for reorganization, and continuing in  chapter 11 will likely lead to substantial diminution of estate resources expended in resolving a complicated, academically interesting, but practically unimportant dispute about governance.

Mr. O'Keefe, whom the court qualified as an expert pursuant to Fed. R. Evid. 702, testified forthrightly but not persuasively regarding the costs of continuing in chapter 11 under his tutelage versus converting the case to chapter 7 with the concomitant appointment of a panel trustee. Throughout his testimony, Mr. O'Keefe emphasized his experience and success in liquidating over 40 corporate entities personally (and supervising numerous other liquidations), suggesting that his firm would enjoy a greater recovery than would be possible through the efforts of any Western District panel trustee. He emphasized the benefit side of the cost-benefit

---

[5] *Cf.* 28 U.S.C. §§ 959(b) & 1652.

analysis, arguing that he and his firm get better results than bankruptcy trustees. His conclusion in this regard was not persuasive, sounding more like advertising than meaningful comparison.

The court does not doubt Mr. O'Keefe's expertise, but he offered nothing factual or otherwise persuasive to suggest that panel trustees in this District are not similarly aggressive or successful in liquidating assets or prosecuting avoidance or lender liability claims.  Indeed, one example of his firm's success on claims against a lender in a case involving debtor misconduct was in connection with his service to one of the court's panel trustees who presumably played some role in effecting the outcome of the *Teleservices* or *Cyberco* matters to which he adverted in his testimony.

With respect to the costs associated with the two competing approaches to liquidation, Mr. O'Keefe admitted on *voir dire* and again on cross examination that he has no basis for evaluating the costs that a local panel trustee would incur in professional fees. Moreover, he conceded on cross examination by counsel for Wells Fargo that his Liquidation Analysis does not include professional fees in the context of a contested chapter 11 confirmation.  Indeed, the Liquidation Analysis plainly states as much. *See* Liquidation Analysis at n. 7 (estimate of $295,000 in chapter 11 professional fees "assumes an uncontested Plan Confirmation process.").

A review of the liquidation analysis also reveals that the only substantial difference between the cost of liquidating through a chapter 11 plan and the cost of liquidating through a chapter 7 trustee is reflected in the administrative expenses on the second to last line of the table. In addition to failing to account for a contested confirmation hearing—which appears to be a certainty given Wells Fargo's stated opposition to the plan and the carve-out on which it depends—the second to last line comparing the administrative expenses is not in fact an apples-to-apples comparison. Specifically, the estimated chapter 7 costs take the case through

conclusion, and the estimated costs of liquidating through O'Keefe are limited through the effective date of the plan, predicted to be some time in August of this year.

Moreover, it seems reasonable to conclude that converting the cases to chapter 7 will eliminate the expenses associated with the Committee's accountants, lawyers, and other consultants, if any. Rather, the chapter 7 trustee will perform the functions that up to now the Committee and O'Keefe have jointly (and capably) been performing. In short, the liquidation analysis and the testimony of Mr. O'Keefe failed to persuade the court that the benefits of liquidating under chapter 11 exceed the benefits of converting the case to chapter 7.

As the UST argued forcefully during the Show Cause Hearing, all that remains to be done in the context of these chapter 11 cases is the usual stuff of chapter 7: distributing proceeds in accordance with the statutory scheme expressed in 11 U.S.C. § 726, marshaling remaining assets (such as crop insurance claims and the Monsanto settlement), and prosecuting avoidance claims and other causes of action.[6]

Throughout these proceedings, the court has carefully considered the views of the Committee and its experienced counsel, and has done so in reaching today's decision. During the sale process, of course, Wells Fargo has concurred in much of what the Committee has sought to accomplish. Nevertheless, the court notes that although the Committee represents unsecured creditors' interests in this proceeding, the expectant holder of the largest unsecured claim—Wells Fargo on account of its estimated $20,000,000.00 deficiency—does not agree with the Committee's position. For this reason, the court notes that the unsecured creditor body does not overwhelmingly support the *status quo*, which diminishes the weight the court places on the Committee's recommendation.

---

[6] The court notes that Mr. O'Keefe's projections regarding the costs of prosecuting the avoidance actions are the same irrespective of whether pursued under chapter 7 or chapter 11. *See* Liquidation Analysis at n. 7 (DN 766-2).

III. CONCLUSION

Perhaps the Committee and O'Keefe accurately estimate their own unique knowledge, expertise, and negotiation skills in this case. If so, their assistance, whether under 11 U.S.C. § 327 or Federal Rule of Bankruptcy Procedure 2004, may be available to the incoming chapter 7 trustee.   But, considering the present status of the case and making an informed prediction about the expense of liquidating under chapter 7 (thereby avoiding a contested confirmation, Committee expense, and likely expense of a chapter 11 trustee), the court concludes that conversion to chapter 7 for cause is appropriate and in the best interests of the estate.  Finally, the court shares the concerns that all parties expressed about the costs of a chapter 11 trustee, particularly given that the Debtors have largely been liquidated during the recent bulk and remnant sales.

The conclusions expressed in this Opinion resolve the Debtors' Motion to Enforce, and warrant a separate order converting the cases to chapter 7.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Motion to Enforce (DN 763) is DENIED.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Michael S. McElwee, Esq., Robert D. Mollhagen, Esq., Diana Psarras, Esq., Steve Jakubowski, Esq., John R. Burns, Esq., Michael R. Stewart, Esq., Wendy K. Walker-Dyes, Esq., Colin F. Dougherty, Esq., Joseph M. Ammar, Esq., Michelle M. Wilson, Esq.,  and all parties who have appeared or requested notice in this case.

**IT IS SO ORDERED.**

**Dated May 29, 2013**



Scott W. Dales
United States Bankruptcy Judge